UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

CRIMINAL ACTION NO. 5:24-CR-00108-DCR-EBA-2

UNITED STATES OF AMERICA,                                                      PLAINTIFF,

V.                                     **REPORT AND RECOMMENDATION**

CURTIS J. PHILLIPS,                                                              DEFENDANT.

*** *** *** ***

This matter is before the Court on Defendant Curtis J. Phillips' Motion to Suppress evidence derived from the warrantless search of his vehicle on March 17, 2023. [R. 20]. The United States filed a Response opposing Phillips' Motion, [R. 24] and Phillips' filed a Reply. [R. 25]. On January 16, 2025, the Court held an evidentiary hearing on the matter. [R. 21; R. 27]. This matter is now ripe for review.

FINDINGS OF FACT

On March 17, 2023, Lee County Sheriff Joe Lucas and Deputy Brook Moore were attempting to serve a subpoena on an individual named Travis Tutt. [R. 20-1 at pg. 1]. After receiving information that Tutt could be found at the home of Johnny Shuler, they traveled to his residence at 342 Fred Fox Road in Beattyville, Kentucky.[1] [*Id.*; R. 24 at pg. 1]. The officers parked in Shuler's driveway, exited their vehicle, and began walking up Shuler's driveway towards his

---

1 Beattyville, Kentucky sits in Lee County, which Sherriff Lucas testified is home to roughly 7,200 people.

1

residence. [R. 24 at pg. 2].

While on their way to the front door, the officers had to walk past a white Ford SUV parked in the driveway. [*Id.*]. Sherriff Lucas testified that he did not recognize the vehicle when he arrived. As the officers approached the vehicle, Sherriff Lucas noticed that it was running and observed two individuals in the vehicle leaned back in their seats, both of whom appeared to be either asleep or passed out. [*Id.*]. Lucas testified that he recognized one of the passengers to be Defendant Phillips, who he knew to be a convicted felon, involved in drug trafficking, and a user of illegal drugs. Cognizant of several overdoses which had recently occurred in Lee County, and having experience responding to overdoses, Sherriff Lucas was concerned for Phillips' and the other passenger's well-being. He began tapping on the windows of Phillips' vehicle and calling out to him by name.[2] When these efforts failed to wake either Phillips or his passenger, Lucas opened the driver's door, [*Id.*; R. 20-1 at pg. 2], and he either tapped or shook Phillips in a further attempt to wake him. Both Phillips and the other passenger quickly awoke, and the officers confirmed their well-being. Beyond opening the vehicle door and touching Phillips, Sherriff Lucas testified that neither he nor Office Moore ever entered the vehicle.

After determining that they were both okay, Sherriff Lucas began asking Phillips whether he had any information on the whereabouts of Tutt. While speaking with Phillips about Tutt, Lucas testified that he was on alert and scanned the vehicle for signs of drugs, drug paraphernalia, weapons, or any other contraband. He did not identify any contraband in the time he was checking on Phillips' well-being. But within a few moments of confirming Phillips' well-being and asking him for information on Tutt, Sherriff Lucas observed a metal or silver-lined, camouflage-covered

---

[2] Sherriff Lucas testified that both the driver and front passenger windows were cracked open about two inches.

case in the rear passenger area of Phillips' vehicle through the rear passenger window, though he could not see the entire case. He immediately believed it to be a firearm case, and told Phillips that he should know that, as a convicted felon, he cannot possess a firearm. Phillips claimed it was only cosmetics case and began to reach for it. [R. 24 at pg. 2]. Sheriff Lucas instructed Phillips to keep his hands off the case—for his and Officer Moore's safety—and Phillips complied. Lucas then opened the rear passenger door of Phillips' vehicle, retrieved the case, and opened it. But rather than firearms, as he had expected, the case was full of methamphetamine, fentanyl, marijuana, and scales. [R. 24 at pg. 2]. Sheriff Lucas placed Phillips under arrest.

On November 7, 2024, Phillips was indicted by a federal grand jury on drug trafficking and firearm-related offenses resulting from his interaction with Sherriff Lucas on March 17, 2023. [R. 1]. Now, Phillips seeks to suppress all evidence derived from the search of his vehicle on March 17, 2023, including the drugs found inside his case. [R. 20].

## ANALYSIS

For the reasons articulated below, the undersigned will recommend that Phillips' motion to suppress be denied. In reaching this recommendation, the undersigned finds that: (1) Phillips did not have a reasonable expectation of privacy as a guest at Shuler's residence, but even if he did, Shuler's driveway is not part of the curtilage of his home, and the officers were lawfully on the premises; (2) the officers did not violate Phillips Fourth Amendment rights when they opened his vehicle's door to check on his well-being, as such conduct was reasonable under the community caretaker exception; and (3) Sherriff Lucas' warrantless search and seizure of Phillips' case did not violate the Fourth Amendment because the plain view and automobile exceptions apply, and even if they didn't, his actions were justified under the lesser standard of reasonable suspicion

3

because Sherriff Lucas reasonably feared for his and Officer Moore's safety.

## A. Whether the officers' warrantless entry onto Shuler's property violated the Fourth Amendment

Phillips first argues that the officers' warrantless entry onto Mr. Shuler's driveway was unlawful. [R. 20-1 at pgs. 2–4]. Phillips asserts that he had a reasonable expectation of privacy in the home and adjacent drive "by virtue of his relationship with the owner" because Mr. Shuler gave him permission to "store personal items on the property and stay overnight." [*Id.* at pg. 3]. In response, the United States contends that this generalized and unsupported statement is insufficient to establish that Phillips was an overnight guest who enjoys a reasonable expectation of privacy in a third parties' home. [R. 24 at pg. 5].

### 1. Whether Phillips had a reasonable expectation of privacy in Shuler's home.

In relevant part, the Fourth Amendment provides that the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. Because "the Fourth Amendment protects people, not places," *Katz v. United States*, 389 U.S. 347, 351 (1967), the "touchstone" of Fourth Amendment analysis is "whether a person has a 'constitutionally protected reasonable expectation of privacy'" in the area in which the government physically intruded. *Oliver v. United States*, 466 U.S. 170, 177 (1984) (quoting *Katz*, 389 U.S. at 360 (Harlan, J., concurring)). An individual has a reasonable expectation of privacy, and thus can claim the protection of the Fourth Amendment, where they have (1) "exhibited an actual (subjective) expectation of privacy" in the invaded area and (2) the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. 347, 361 (Harlan, J., concurring). A person seeking the Fourth

Amendment's protection has the burden to establish that this reasonable expectation of privacy test is met. *See United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001) (stating that the defendant "has the burden of establishing his standing to assert a Fourth Amendment violation").

"A person—whether social guest or renter—has a reasonable expectation of privacy in the place where he sleeps at night." *United States v. Allen*, 720 Fed.App'x. 254, 257 (citing *See Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990). However, an individual "who is merely present with the consent of the householder may not" claim the protection of the Fourth Amendment. *Olson*, 495 U.S. at 90.

Here, Phillips has not met his burden of demonstrating that he was an overnight guest at Shuler's residence. Phillips asserts that he was permitted to be on the property without any evidence to support this claim, claiming only that he was granted permission "to store personal items on the property and stay overnight." [R. 20-1 at pg. 3]. But logically, if Phillips was permitted to stay overnight, he would not have chosen to sleep in his car in the driveway. Indeed, if Shuler had given him permission to stay overnight, surely he would have also permitted Phillips to enter his residence to sleep during the day. These facts thus undermine the credibility of Phillips' blanket assertions. *See, e.g.*, *United States v. Cozart*, No. 3:19-CR-123-RLJ-HBG, 2022 WL 1521511, at *9 (E.D. Tenn. Jan. 24, 2022) (finding that defendant had no reasonable expectation of privacy because "the fact that Defendant was asleep in a car in the driveway and did not seek to enter the residence seems to belie his assertion that he was an overnight guest at the residence"). Therefore, even assuming *arguendo* that Phillips had a subjective reasonable expectation of privacy, Phillips lacks any expectation of privacy which society would be prepared to recognize as reasonable. Accordingly, Phillips has no standing on which to challenge the officer's entry onto Shuler's

5

property.

### 2. *Whether the Shuler's driveway is part of the curtilage of his home.*

Even assuming that Phillips did have a subjective and objective reasonable expectation of privacy in Shuler's home as an overnight guest, the driveway where his vehicle was parked is not part of the home's curtilage. The Fourth Amendment views "the home [as] first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013). The home's paramount protections also contemplate its curtilage, which the Supreme Court regards as "the area 'immediately surrounding and associated with the home.'" *Id.* (quoting Oliver v. United States, 466 U.S. 170, 180 (1984)). When determining whether an area surrounding the home falls within its curtilage, courts consider the "proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation." *United States v. Dunn*, 480 U.S. 294, 301 (1987).

Here, Shuler's driveway is not part of the curtilage. While connected to the home, the driveway is not contained within any sort of enclosure. Nor were any steps taken—such as a putting up a fence—to protect it from the view of passersby. As Phillips admits, "the driveway is easily accessible and visible" from the road. [R. 20-1 at pg. 3]. That the road itself is "infrequently trafficked by anyone" other than locals is inconsequential. Moreover, as evidenced by the fact that Phillips was parked there, Shuler clearly treated his driveway in a more communal fashion.[3] Taken together, the consideration of all relevant factors leads to the conclusion that Shuler's driveway

---

3 Sherriff Lucas testified that Shuler's residence was known in the community as a "party house," and that it was normal for multiple cars to be parked in his driveway.

was not a part of the curtilage of his home. Accordingly, even if Phillips had a reasonable expectation of privacy in Shuler's residence, the Fourth Amendment's protections do not extend to where he was parked on the driveway.

### 3.  *Whether the officers lawfully entered Shuler's property.*

Finally, should it be determined that Phillips possessed a reasonable expectation of privacy in the Shuler residence and that the driveway constituted part of the home's curtilage, Phillips' claim should still fail because Sherriff Lucas lawfully entered the property. The Fourth Amendment permits officers to, just like any other private citizen, enter on to an individual's property to initiate a consensual encounter without a warrant. *See Kentucky v. King*, 563 U.S. 452, 469 (2011) ("When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do . . . ."). This theory, often called the "knock and talk" doctrine, contemplates that an officer may "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent an invitation to linger longer) leave." *Jardines*, 569 U.S. at 8. However, this theory does not contemplate officers approaching a home with the intent to "explore the area around the home in hopes of discovering incriminating evidence" because "[t]here is no customary invitation to do *that*." *Id.* at 9 (emphasis in original).

Here, Sherriff Lucas entered and parked on the Shuler driveway solely to serve a subpoena on Tutt. He testified that he had no intention of searching Phillips' car, nor did he intend on conducting any other kind of police business—such as collecting evidence—before he arrived on the property. Only after observing Phillips passed out in his running car did Lucas' intentions change. The Supreme Court has made clear that, under circumstances such as these, no Fourth Amendment rights are infringed. *Cf. Collins v. Virginia*, 584 U.S. 586, 593 (2018) ("When a law

enforcement officer physically intrudes on the curtilage *to gather evidence*, a search within the meaning of the Fourth Amendment has occurred.") (emphasis added). Accordingly, because Sheriff Lucas was on the property for a proper, legitimate, and lawful purpose, no Fourth Amendment violation occurred.

## B. Whether the officers violated the Fourth Amendment when they opened Phillips' car doors to check on his well-being.

Phillips next argues that Sheriff Lucas violated the Fourth Amendment when he opened his vehicle's door to check on him. [R. 20-1 at pgs. 4–6]. The United States argues that no search occurred because Sheriff Lucas' purpose was to serve a subpoena on Travis Tutt, and the officer's "slight detour" to check on Phillips' well-being is permissible under the "community caretaker" exception to the warrant requirement. [R. 24 at pg. 7].

### 1. The Community Caretaker Role of Police.

As discussed above, the Fourth Amendment protects against "*unreasonable* searches and seizures." U.S. CONST. amend. IV (emphasis added). Thus, the government's intrusion into a constitutionally protected area or search of one's private property, even if unwelcome, does not violate the Constitution so long as that intrusion or search was reasonable. *See Caniglia v. Strom*, 593 U.S. 194, 198 (2021); *see also Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 528–29 (1967). While the Fourth Amendment treats the home with the utmost sanctity, "the interior of an automobile is not subject to the[se] same expectations of privacy." *New York v. Class*, 475 U.S. 106, 114 (1986). This so because "the public's reasonable expectations of privacy inside automobiles are lower than they are in other private spaces given that automobiles are readily mobile, potentially dangerous, and heavily regulated." *United States v. Morgan*, 71 F.4th 540, 543

8

(6th Cir. 2023) (citing *California v. Carney*, 471 U.S. 386, 390–93 (1985)).

Consistent with this lessened expectation of privacy, "the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). And while "[s]ome such contacts will occur because the officer may believe the operator has violated a criminal statute," "many more will not be of that nature." *Id.* Because of this reality, courts have long recognized those actions which are "totally divorced from the detection, investigation, or acquisition of evidence relating to" a crime as part of the important "community caretaker" role of police. *Id.*; *see also Morgan*, 71 F.4th at 544–45 (collecting cases). The community caretaker role includes, *inter alia*, responding to exigent circumstances where an officer must "render emergency assistance to an injured occupant." *King*, 563 U.S. at 460 (quoting *Brigham City, Utah v. Stuart*, 543 U.S. 398, 403 (2006)) (internal quotations omitted).

While officers may not act with free rein under this exception, they may act without a warrant where a "well-delineated and carefully cabined exigency" exists. *Morgan*, 71 F.4th at 545 (citing *Caniglia*, 593 U.S. at 198–99). To determine whether such an exigency exists, courts consider the "totality of the circumstances and the inherent necessities of the situation at the time." *United States v. Huffman*, 461 F.3d 777, 783 (6th Cir. 2006) (quoting *United States v. Rohring*, 98 F.3d 1506, 1511 (6th Cir. 1996) (citation and quotation marks omitted)). This is an objective test: "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.'" *Brigham City*, 543 U.S. at 404 (citing *Scott v. United States*, 436 U.S. 128, 138 (1978) (emphasis added)).

***2. Officers did not violate Phillips' Fourth Amendment rights when they opened his***

*vehicle's door to check on his well-being.*

With these standards in mind, the undersigned concludes that Sherriff Lucas' decision to open Phillips' car door for the purpose of checking on his well-being did not violate the Fourth Amendment. At the suppression hearing, Sherriff Lucas testified that the criminal activity of the area largely consisted of drug crimes and drug trafficking. He also testified that, in the months leading up to this his encounter with Phillips, there had been several overdoses in the community. As discussed above, the officers were lawfully on the property for the purpose of serving a subpoena on Tutt. It was only while on his way up the driveway that Sherriff Lucas noticed Philips and another occupant passed out in Phillips' running vehicle. Lucas, a veteran police officer,[4] testified that he was aware of Phillips' history in drug-trafficking, that he had troubles with addiction, and that the Shuler residence was oft-frequented by drug users and had been known for years as a "party house." With this contextual backdrop, Sherriff Lucas was rightfully concerned about Phillips' well-being and worried that he may be suffering, or had suffered, an overdose. Lucas testified that he began tapping on the vehicle's window and calling out Phillips' name to attempt to arouse him. Only after Phillips and the other occupant failed to respond to his repeated efforts to get their attention was the vehicle's door opened.

These facts demonstrate that officers had an objectively reasonable basis to be concerned about Phillips' and the other occupant's well-being. *See Michigan v. Fisher*, 558 U.S. 45, 49 (2009) ("Officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the

---

4 Lucas was elected as Sherriff of Lee County in January 2023. Prior to his election, Sherriff Lucas testified that he served with the Beattyville Police Department for eight years, and then with the Kentucky State Police for seventeen years. While with the Kentucky State Police, he spent seven years with its Drug Enforcement Special division, where he investigated drug trafficking. In this role, he often served as an undercover officer and engaged in "buys" from drug dealers.

10

emergency aid exception."); *Johnson v. City of Memphis*, 617 F.3d 864, 871 (6th Cir. 2010) (noting that, "because the 'ultimate touchstone of the Fourth Amendment is reasonableness, certainty is not required" to invoke the emergency-aid exception to the warrant requirement). Having repeatedly knocked on the window and called out Phillips' name,[5] Phillips' car door was not opened unannounced. *Cf. Morgan*, 71 F.4th at 545 (holding that officer violated Fourth Amendment when opening a car door to check on the well-being of the occupant without first "tak[ing] advantage of any  .  . less-intrusive measures" such as "turning on the police car's emergency lights; shining a flashlight into Morgan's face; calling out to Morgan; or knocking on the window"). Thus, even if officers had immediately come upon evidence of a crime after opening Phillips' car door, which they did not, [*see* R. 24 at pg. 7], the community caretaker exception to the warrant requirement justifies the officers' actions because they were objectively reasonable under the circumstances. Accordingly, Phillips' argument to the contrary must fail.

**C.  Whether Sherriff Lucas's warrantless search and seizure of Phillips' case violated the Fourth Amendment.**

Phillips next argues that the search and seizure of his briefcase violated the Fourth Amendment and was not justified by any exception. [R. 20-1 at pgs. 6–10]. Specifically, Phillips contends that the plain view exception does not justify Sherriff Lucas' actions because the incriminating nature of the case was not immediately apparent. [*Id.* at pgs. 7–8]. In response, the United States avers that the plain view and automobile exceptions apply. [R. 24 at pgs. 8–10].

*1.  Whether the Plain View Doctrine Applies.*

While a warrantless search and seizure presumptively violates the Fourth Amendment,

---

5 Sherriff Lucas testified that both the driver and front passenger windows were cracked open about two inches.

"under certain circumstances an officer may seize evidence in plain view without a warrant." *United States v. Mathis*, 738 F.3d 719, 732 (6th Cir. 2013) (citing *Arizona v. Hicks*, 480 U.S. 321, 326–27 (1987)). To justify the admission of evidence seized without a warrant under the plain view exception, four factors must be met: "(1) the item seized must be in plain view, (2) the item's incriminating character must be immediately apparent, (3) the officer must lawfully be in the place from where the item can be plainly seen, and (4) the officer must have a lawful right of access to the item." *Id.* (citing *Horton v. California*, 496 U.S. 128, 136–37 (1990)).

Phillips does not appear to dispute that the case was in plain view. [R. 20-1 at pg. 7]. However, the parties dispute the second, third, and fourth elements. Accordingly, each will be addressed in turn.

### a. *Whether the incriminating nature of Phillips' case was "immediately apparent" to Sherriff Lucas.*

Phillips argues that the case's incriminating nature was not "immediately apparent" because the case's unique size, shape, and lack of any labels associating it with gun ownership indicate that Sherriff Lucas could not have readily identified it as a gun case. [R. 20-1 at pgs. 7–8].

While the plain view doctrine permits warrantless seizures, this exception does not generally extend to closed containers. *See Ross*, 456 U.S. at 822–23 (noting that the Fourth Amendment protects "the owner of every container that conceals its contents from plain view"). However, the plain view exception may permit the warrantless seizure of a closed container where the container's outward appearance enables an observer to infer its contents. *See Arkansas v. Sanders*, 442 U.S. 753, 764 n. 13 (1979), *overruled on other grounds* by *California v. Acevedo*, 500 U.S. 565 (1991) (noting that "some containers (for example a kit of burglar tools or a gun

12

case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance"). This so-called "single-purpose container rule" holds that, "if the distinctive configuration of a container proclaims its contents, the contents cannot be fairly said to have been removed from a searching officer's view." *Robbins v. California*, 453 U.S. 420, 428 (1981), *overruled on other grounds by United States v. Ross*, 456 U.S. 798 (1982).

The Sixth Circuit has not articulated a specific standard for courts to follow when determining whether an officer could perceive the criminal nature of a closed container's contents. Acknowledging the Sixth Circuit's lack of guidance in this scenario, the United States contends that this Court should adopt the Fourth Circuit's law enforcement-centered approach, which "tak[es] into account an officer's perspective and experience along with the totality of the circumstances under which the container was discovered." [R. 24 at pgs. 8–9 (citing *United States v. Davis*, 690 F.3d 226, 235 (4th Cir. 2012)]. This standard, it is argued, aligns with the Sixth Circuit's approach to assessing more generally whether the incriminating nature of an object is immediately apparent. [*Id.*]. In light of Sherriff Lucas' training, experience, and the totality of the circumstances, the United States avers that the incriminating nature of the case was immediately apparent. [*Id.*]. In reply, Phillips argues that the more reasonable approach to adopt is that of the Ninth and Tenth Circuits, which addresses this question by determining whether the outward appearance of the container would reveal its contents to a layperson. [R. 25 at pgs. 1–2 (first citing *United States v. Gust*, 405 F.3d 797 (9th Cir. 2005); then citing *United States v. Bonitz*, 826 F.2d 954 (10th Cir. 1987)]. And in the eyes of a layperson, Phillips argues, the case's incriminating nature is not immediately apparent, so the plain view exception does not apply. [*Id.*].

13

The Fourth Circuit permits the search of a closed container under the plain view exception where "'the contents of a seized container are a foregone conclusion.'" *Davis*, 690 F.3d at 235 (quoting *United States v. Williams*, 41 F.3d 192, 197 (4th Cir. 1994)). The contents of a closed container are said to be a "foregone conclusion" when "the circumstances under which an officer finds the container may add to the apparent nature of its contents." *Id.* (quoting *Williams*, 41 F.3d at 197). Thus, courts may consider an officer's experience when determining whether the contents of a closed container are a foregone conclusion. *Id.* (citing *Williams*, 41 F.3d at 198). Importantly, the incriminating nature of the contents of a closed container cannot be readily apparent under this approach unless the officer is confident that the container holds contraband as soon as he lays eyes on it. *Id.*

The Ninth and Tenth Circuits take a different approach. They contend that, because the single-purpose container rule "focuses upon an individual's reasonable expectation of privacy, which is established by 'general social norms,' the extent to which a container's exterior reveals its contents should not be solely determined either by the circumstances of its discovery, or by the experience and expertise of law enforcement officers." *United States v. Miller*, 769 F.2d 554, 560 (9th Cir. 1985) (citing *Robbins*, 453 U.S. at 428) (internal citations omitted). Fearful that taking an officer's experience and expertise into account would effectively obviate the Fourth Amendment's warrant requirement, courts in these circuits have taken a layperson-centered approach to resolving this question. This approach has led courts in these circuits to consistently reject arguments reliant on law enforcement experience and expertise. *See, e.g.*, *id.* (rejecting government's argument that contents of plastic bag were "obvious" to the officer because of his experience and expertise); *Gust*, 405 F.3d at 803–05 (expressly rejecting government's argument

14

that, under the single-purpose container rule, "a person cannot have a legitimate expectation of privacy in containers that experienced officers can identify as gun cases"); *Bonitz*, 826 F.2d at 956–57 (rejecting argument that hard-sided gun case fell under single-purpose container rule because, despite the officer's experience and expertise, the case "did not reveal its contents . . . even though it could perhaps have been identified as a gun case).

After considering each standard and accompanying decisions, the undersigned finds the Fourth Circuit's approach most convincing. Not only does this standard align with the Sixth Circuit's articulated standard for determining whether an object's incriminating nature is "immediately apparent,"[6] it also permits the Court to consider Sherriff Lucas' training, experience, and personal knowledge of Phillips and his community. When considering the nature of police work, this approach makes the most practical sense: "After all, it is trained officers who are actually encountering closed containers during investigations and arrests, and their real time assessment of such a container is relevant to a court's post-hoc inquiry into the reasonableness of their decision-making." *United States v. Smith*, No. 17-CR-258, 2022 WL 2965161, at *9 (N.D. Ohio July 27, 2022). Moreover, as has been noted by another court in this Circuit to consider the split:

> the Ninth [and Tenth] Circuit's sole reliance on a lay person's perspective is seemingly divorced from the reality of a law officer's daily work. Its standard would require an officer to ignore his training and attempt to put himself in the shoes of a lay person when assessing a closed container, all while simultaneously

---

6 In making this determination, the Sixth Circuit has instructed courts to look at four factors:

> (1) a nexus between the seized object and the items particularized in the search warrant; (2) whether the "intrinsic nature" or appearance of the seized object gives probable cause to believe that it is associated with criminal activity; (3) whether the executing officers can *at the time* of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature; . . . [and (4) whether the officer can] recognize the incriminating nature of an object as a result of his immediate or instantaneous sensory perception.

*United States v. Loines*, 56 F.4th 1099, 1108 (6th Cir. 2023) (quoting *United States v. Garcia*, 496 F.3d 495, 510–11 (6th Cir. 2007) (emphasis in original)). Importantly, factors (3) and (4) specifically contemplate an officer's training and experience.

managing a potentially dangerous situation and making an arrest.

*Id.*

Under the Fourth Circuit's approach, the undersigned finds that, given Sherriff Lucas' training and experience, the incriminating nature of the case was immediately apparent. Sherriff Lucas testified that, upon observing the metal-lined case, he immediately recognized it as a gun case. He reached this conclusion given the case's camouflage pattern, which he identified with hunting and firearms based on his own personal and professional experience seeing firearms kept within containers of a similar nature and design. Sherriff Lucas also testified that Beattyville, Kentucky community is a small, rural community where hunting is commonplace. While Phillips argues that the shape of the case disqualifies it as a gun case, [*see* R. 20-1 at pg. 8 (likening Phillips' case to a "poker chip set" case because "[t]he case is far too small to contain a rifle and, while it may be large enough to carry some smaller handgun models, it would be a very unusual shape for a pistol carrying case")], Sherriff Lucas testified that he could only see "probably three-fourths" of the case in plain view.[7] Thus, what Sherriff Lucas observed was a metal-lined, relatively compact, camouflage-covered case in a community where hunting is commonplace and at a residence known for being host to criminal activity. In light of his training and experience, then, one can reasonably conclude that Sherriff Lucas' believed it was a foregone conclusion the case contained firearms.

Furthermore, Sherriff Lucas testified that he had often encountered Phillips while in his capacity as a police officer and was familiar with him. He knew Phillips had a history of involvement in drug trafficking, that he often used illegal drugs, and that he was a convicted felon.

---

7 Phillips' brief indicates that the case is "approximately 22" in length and 8" in height." [R. 20-1 at pg. 8].

His encounter with Phillips on March 17 occurred at Shuler's residence, which Lucas testified was known in the community for being a "party house" and was often frequented by drug users and those who, like Phillips, were involved in drug-related criminal activities. Given the close nexus between drug-related crimes and firearm possession, it was reasonable for Lucas to immediately conclude that the case contained a firearm. This conclusion is further supported by the fact that Sherriff Lucas knew Phillips was a convicted felon and therefore could not lawfully possess a firearm. Accordingly, given the totality of the circumstances and Sherriff Lucas' own training and experience, the incriminating nature of contents of Phillips' closed case was a foregone conclusion to Sherriff Lucas. Therefore, the first element of the plain view exception is met.

Even if Sherriff Lucas' actions were judged under the Ninth and Tenth circuits' lay-person standard, the case's criminality would still be immediately apparent. Indeed, a reasonable layperson from the area could come to the immediate conclusion that a metal-lined, relatively compact, and camouflage-covered case contained a weapon. This is especially true given the abundance of hunting in Lee County and rural Kentucky more generally. But even beyond a more rural community, there is a well-known association between camouflage and hunting. And while not every person goes hunting with a firearm, many do. Thus, upon observing Phillips' case, a reasonable layperson could immediately determine that it contained firearms. Of course, the conclusion that Phillips' possession of a case holding firearms was a crime is only possible with Sherriff Lucas' knowledge of Phillips' criminal history. But even under the Ninth and Tenth Circuit's standard, at least some consideration of an officer's experience is appropriate. *See Miller*, 769 F.2d at 560 (citing *Robbins*, 453 U.S. at 428) (noting that the incriminating nature of a closed container's "contents should not be *solely* determined either by the circumstances of its discovery,

or by the experience and expertise of law enforcement officers") (emphasis added). Moreover, because this standard prioritizes the privacy interests of the individual challenging the government's conduct, *see Miller*, 769 F.2d at 560 (citing *Robbins*, 453 U.S. at 428) (noting that the rationale of the single purpose container rule "focuses upon the individual's reasonable expectation of privacy"), Sherriff Lucas' testimony that Phillips' case was visible to him simply by looking through the rear window of Phillips' vehicle is consequential. Thus, any person walking by Phillips' vehicle—whether a layperson or a police officer—could have observed the case by simply looking into the vehicle. Accordingly, any privacy interest Phillips might claim in this regard is diminished. *See United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011) (quoting *United States v. Campbell*, 549 F.3d 364, 373 (6th Cir. 2008)) (noting that "a motorist has 'no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers"). Therefore, even if determined under the Ninth and Tenth Circuit's layperson standard, the incriminating nature of the contents Phillips' closed case was still immediately apparent to Sherriff Lucas, and the first element of the plain view exception is met.

### b. Whether Sherriff Lucas was lawfully located in a place where Phillips' case could be seen.

Phillips next contends that the case was not viewed by an officer who was lawfully located in a place from where the item could be seen. [R. 20-1 at pg. 9]. However, as previously established above, the officers were lawfully present on Shuler's property because they were there to serve a subpoena on Tutt. Moreover, also as discussed above, the officers were also justified in straying from their initial object to check on Phillips' and his fellow occupant's well-being. Accordingly, Sherriff Lucas was lawfully located in a placed from where the case could be seen, and the second

18

element of the plain view exception is met.

    ***c. Whether Sherriff Lucas had a lawful right of access to Phillips' case.***

Phillips avers that the case was seized by an officer who did not have a lawful right of access to the object itself. [R. 20-1 at pg. 10]. However, "[t]he automobile exception relieves law enforcement officers of the [Fourth Amendment's] requirement to obtain a warrant before seizing and conducting a search of an automobile where probable cause exists to believe that evidence of a crime will be found in the car." *United States v. Whipple*, 92 F.4th 605, 613 (6th Cir. 2024). An officer has probable cause "when 'there is a fair probability that contraband or evidence of a crime will be found from a particular place.'" *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). This is a "flexible, common-sense standard. It merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband." *Texas v. Brown*, 460 U.S. 730, 742 (1983) (internal citations and quotation marks omitted).

Here, Sherriff Lucas had probable cause to search Phillips' vehicle when he observed the case in the car. Lucas testified that he knew Phillips and was aware that he is a felon. And as a convicted felon, Lucas knew that Phillips is prohibited from owning firearms. Thus, believing there to be a fair probability that Phillips had committed a crime, the automobile exception provided Sherriff Lucas with a lawful right of access to the car. *See Ross*, 456 U.S. at 820, 825 ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search."); *see also United States v. Galaviz*, 645 F.3d 347, 357 (6th Cir. 2011) (citing *Boone v. Spurgess*, 385 F.3d 923, 928 (6th Cir. 2004)) (finding that officers had right to search the interior of an automobile when they saw a

gun in the car because the automobile exception "provided officers with a lawful right of access to the car sufficient to satisfy the plain-view exception"). Accordingly, because Sherriff Lucas had probable cause to search Phillips' vehicle, he had a lawful right of access to the case, and the third element of the plain view exception is met. Accordingly, because Sherriff Phillips was able to seize Phillips' case without a warrant under the plain view and automobile exceptions, he did not violate the Fourth Amendment.

### 2. *Whether Sherriff Lucas should have obtained a search warrant before opening Phillips' case.*

Finally, Phillips maintains that the officers should have obtained a warrant before opening the case. [R. 20-1 at pg. 10]. But it has long been established that "[t]he police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence [of a crime] is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991). As discussed above, Sherriff Lucas observed the case in plain view in the back of Phillips' vehicle. Given his knowledge that Phillips was a convicted felon, his observation of what he immediately perceived to be a gun case gave him probable cause to search Phillips' vehicle. And because Sherriff Lucas had probable cause to search Phillips' vehicle, he was justified in opening Phillips' case.[8] Accordingly, Sherriff Lucas did not violate the Fourth Amendment when he opened Phillips' case without a warrant.

### D. *Whether the officers' actions were supported by a reasonable suspicion of criminal activity.*

---

8 That Phillips' case contained drugs as opposed to a firearm is inconsequential, as whether an officer has probable cause does not turn on the correctness of the officer's beliefs. *See Brown*, 460 U.S. at 742 (noting that probable cause "does not demand any showing that [an officer's] belief be correct or more likely true than false"); *see also Michigan v. Long*, 463 U.S. 1032, 1050 (1983) (collecting cases) ("If, while conducting a legitimate *Terry* search of the interior of the automobile, the officer should, as here, discover contraband other than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances.").

The United States alternatively argues that his actions were supported by a lesser showing of reasonable suspicion because of the need to ensure the officers' safety, should the Court find that Sherriff Lucas did not have probable cause to seize and search Phillips's case. [R. 24 at pgs. 11–12]. In response, Phillips argues that Sherriff Lucas had no reasonable suspicion to conclude that Phillips possessed a weapon or that he might gain immediate control of a weapon. [R. 25 at pgs. 2–3].

The Supreme Court has held that an officer may search the passenger compartment of an automobile if the officer "possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1036 (1983) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Reasonable suspicion is a less demanding standard than probable cause, as courts determine whether it exists under the "totality of the circumstances" and by "view[ing] the evidence offered . . . using a common sense approach, as understood by those in the field of law enforcement." *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004). Moreover, a weapon is considered to be within a person's "immediate control" if it is "inside the relatively narrow compass of [a vehicle's] passenger compartment" because it is "within the area into which an arrestee might reach in order to grab a weapon or evidentiary ite[m].'" *New York v. Belton*, 453 U.S. 454, 460 (1981) (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)). This same logic also justifies police in opening closed containers found within a vehicle, "for if the passenger compartment is within the reach of the arrestee, so will containers in it be within his reach." *Id.*

Here, Sherriff Lucas had at least a reasonable suspicion that Phillips may be armed and

dangerous. Sherriff Lucas came upon Phillips in his car while serving a subpoena on Tutt at a house known to be frequented by drug users and others engaged in criminal activity. He also specifically recognized Phillips, who he knew to be involved in drug trafficking and a convicted felon. After ensuring that Phillips was not overdosing, he observed a metal, camouflage-covered case in the back of Phillips' car, which he believed to contain a firearm. Sherriff Lucas' uncontroverted testimony was that, when he asked Phillips about the case, Phillips immediately began to reach for it.[9] Sherriff Lucas also testified that, because of his experience working as an undercover drug enforcement officer, he was aware that individuals engaged in drug trafficking often possessed a firearm. Because he believed the case to have a gun, his immediate concern went to that of his and Officer Moore's safety. Lucas testified that, whenever a gun is involved in a traffic stop, he is "leery of it," and that Officer Moore's inexperience contributed to his leeriness.[10]

Given these facts, Lucas could have reasonably concluded that his and Officer Moore's safety could be in danger if Phillips got a hold of the case and its contents. Sherriff Lucas was forced to make a "quick decision as to how [best] to protect himself and others from possible danger." *Terry*, 392 U.S. at 24. Under the totality of the circumstances, then, Lucas had reasonable suspicion to believe that Phillips was dangerous and might gain immediate control of a weapon. *See Long*, 463 U.S. at 1036. And because the case was within Phillips' immediate control, Sherriff Lucas was justified in opening it to secure the potential threat(s) it might contain. *See Belton*, 453 U.S. at 460. Accordingly, Sherriff Lucas did not violate Phillips' Fourth Amendment rights.

---

9 Neither Phillips, nor the other passenger, were restrained at this time, and both of them could reach and access the case.
10 Sherriff Lucas testified that, at the time of the incident, Officer Moore had only been with the Lee County Sherrif's Department for about a month and had no prior law enforcement experience.

CONCLUSION

Phillips moves to suppress evidence derived from the search of his vehicle on March 17, 2023. However, Sherriff Lucas had a valid Fourth Amendment basis to enter the Shuler property and approach Phillips' vehicle. He then developed probable cause to search Phillips' vehicle, seize his case, and search it. But even if Sherriff Lucas didn't have probable cause to search and seize the case, he at least had a reasonable suspicion that Phillips was potentially armed and dangerous, and he was therefore justified in seizing and searching the case. Accordingly, finding no Fourth Amendment violation, the Court will recommend that Phillips' motion to suppress be denied.

RECOMMENDATION

**IT IS RECOMMENDED** that Defendant Curtis J. Phillip's Motion to Suppress, [R. 20], be **DENIED**.

\*\*\* \*\*\* \*\*\* \*\*\*

The parties are directed to 28 U.S.C. § 636(b)(1) for a review of appeal rights governing this Recommended Disposition. Particularized objections to this Recommended Disposition must be filed within fourteen days from the date of service thereof or further appeal is waived. *United States v. Campbell*, 261 F.3d 628, 632 (6th Cir. 2001); *Thomas v. Ann*, 728 F.2d 813, 815 (6th Cir. 1984). General objections or objections that require a judge's interpretation are insufficient to preserve the right to appeal. *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004); *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995). A party may file a response to another party's objections within fourteen days after being served with a copy thereof. 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P. 59(b)(1).

Signed January 27, 2025.

23



Signed By:

*Edward B. Atkins*

United States Magistrate Judge