UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 5: 24-108-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| CURTIS J. PHILLIPS, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendant Curtis Phillips was indicted on November 7, 2024, charging him with five counts of drug trafficking and firearm offenses.  [Record No. 1] Phillips' motion to suppress challenges only the charges from March 17, 2023: knowing and intentional possession with intent to distribute 50 grams or more of methamphetamine (Count 1) and knowing and intentional possession with intent to distribute 40 grams or more of a mixture containing fentanyl (Count 2) both in violation of 12 U.S.C. § 841(a)(1).  [Record Nos. 1 and 20]   jury trial is scheduled to begin March 18, 2025.

The motion to suppress was referred to United States Magistrate Judge Edward B. Atkins for issuance of a Report and Recommendation ("R&R") pursuant to 28 U.S.C. § 636(b)(1)(B).   The Magistrate Judge held an evidentiary hearing on January 16, 2025. Thereafter, he issued an R&R recommending that Phillips' motion to suppress be denied. [Record No. 29] Philips timely filed objections to the Magistrate Judge's R&R.  [Record No. 31] The undersigned has reviewed Phillip's objections *de novo* and agrees that Phillip's motion to suppress should be denied.

## I. Background

Lee County Sheriff Joe Lucas and Deputy Brook Moore encountered Phillips on March 17, 2023, while attempting to serve Travis Tutt legal papers at the home of Johnny Shuler in Beattyville, Kentucky.[1] [Record No. 30 at 12–15]. Sheriff Lucas was familiar with the Schuler residence because it was a known "party house." *Id.* at 16. The officers parked in Shuler's driveway behind an SUV. *Id.* at 21. As they walked up the driveway to the front door, Sheriff Lucas noticed the SUV was running. He observed two individuals in the vehicle "laid back" in their seats who appeared to be either asleep or passed out. *Id.* at 20–21, 42. Sheriff Lucas testified that he recognized the driver (Phillips) who he knew to be a convicted felon involved in drug trafficking and a user of illegal drugs. *Id.* at 22–23. Concerned that Phillips and the female passenger may be overdosing, Sheriff Lucas testified that he tapped on the cracked open window and called Phillips' name. *Id.* at 23, 29.

When these efforts failed to wake either occupant, the officers opened both front doors, and they quickly awoke. *Id.* at 24–25. Sheriff Lucas immediately began looking around the vehicle for signs of drug use but found none. *Id.* at 24. He then asked Phillips if he was okay, to which Phillips responded that he was just tired and had fallen asleep. *Id.* at 25.

After determining that the occupants were not overdosing, Sherriff Lucas began asking Phillips if he had seen Tutt. *Id.* During this conversation, Sheriff Lucas testified that he visually scanned the vehicle, "looking everywhere" for signs of criminal activity. *Id.* at 25, 45, 47. At this point, he observed a case on the rear floorboard through the rear passenger

---

[1] Beattyville is in Lee County, which Sherriff Lucas testified is home to roughly 7,200 people. [Record No. 30 at 5]

window.  *Id.* at 25, 53.  Sheriff Lucas could see a portion (roughly 3/4) of the camouflage-covered case with metal trim that he recognized as a gun case.  *Id.* at 30, 46.

Aware that Phillips was a convicted felon, Sheriff Lucas inquired, "[W]hat that gun case is there[?]" and reminded Phillips that he was prohibited from possessing firearms.  *Id.* at 31–32.  Sheriff Lucas testified that Phillips said it was a makeup case and "reached behind him with his right hand, picked up the case, and moved it."  *Id.* at 33.  Sheriff Lucas told Phillips to keep his hands off the case, and Phillips threw it back down.  *Id.*  Concerned for his and Deputy Moore's safety, Sheriff Lucas opened the rear passenger door and "grabbed the case."  *Id.* at 34.  He testified that the case "had some weight to it" but that he was "shocked" to open it and find it full of methamphetamine, fentanyl, marijuana, and scales.[2]  *Id.* at 36, 50.  Phillips was then placed under arrest.  *Id.* at 38.



---

[2] Roughly two-and-a-half pounds of drugs were found in the case.  [Record No. 30 at 37].

[Record Nos. 20-4 (showing an image of the actual case) and 20-1 at 8 (noting the case bore the insignia "Realtree Hardwoods," was about 22 by 8 inches, and a Google image search indicated it was likely a poker chip case)]

Phillips was indicted by a federal grand jury on drug trafficking and firearm-related offenses, some of which resulted from his interaction with Sherriff Lucas in Schuler's driveway.  [Record No. 1] The defendant has moved to suppress all evidence found inside the case.  [Record No. 20]

## II.  Legal Standard

The United States' Fourth Amendment to the Constitution protects individuals from unreasonable searches and seizures.  *See Horton v. California*, 496 U.S. 128, 133 (1990).  "A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property."  *Id.* (citing *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).  The plain view exception allows law enforcement to seize an item when certain requirements are satisfied.  *United States v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007) (citations omitted).

"[S]earches conducted outside the judicial process . . . are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."  *Katz v. United States*, 389 U.S. 347 (1967).  One example is the automobile exception, which allows a warrantless search when officers have "'probable cause to believe that the vehicle contains evidence of a crime.'"  *United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011) (quoting *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007)).

### III.  Analysis

Philips objects to the Magistrate Judge's determination that the officers' warrantless entry onto the driveway was lawful; the warrantless opening of the vehicle door was lawful under the community caretaker exception; the seizure and search of the case were justified under the plain view and automobile exceptions; the incriminating nature of the case was immediately apparent to the officer; the officers were lawfully located where they observed the case; the officers had a lawful right of access to the case; and the officers' actions were supported by reasonable suspicion.  [Record No. 31]

**Warrantless Entry on Driveway**

The "touchstone" of a Fourth Amendment analysis is "whether a person has a 'constitutionally protected reasonable expectation of privacy'" in the area the government physically intruded.  *Oliver v. United States*, 466 U.S. 170, 177 (1984) (quoting *Katz*, 389 U.S. at 360 (Harlan, J., concurring)).  An individual has a reasonable expectation of privacy where they have (1) "exhibited an actual (subjective) expectation of privacy" in the invaded area and (2) the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable.'"  *Katz*, 389 U.S. at 361 (Harlan, J., concurring).

A person seeking the Fourth Amendment's protection has the burden to establish that this reasonable expectation of privacy test is met.  *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001) (stating that the defendant "has the burden of establishing his standing to assert a Fourth Amendment violation").  "A person—whether social guest or renter—has a reasonable expectation of privacy in the place where he sleeps at night."  *United States v. Allen*, 720 Fed. App'x. 254, 257 (citing *Minnesota v. Olson*, 495 U.S. 91, (1990)).  However, an

individual "who is merely present with the consent of the householder may not" claim the protection of the Fourth Amendment. *Olson*, 495 U.S. at 90.

When determining whether an area surrounding the home falls within its curtilage, courts consider the "proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation." *United States v. Dunn*, 480 U.S. 294, 301 (1987).

Phillips argues that he had a reasonable expectation of privacy in Schuler's driveway because of his relationship with him and express permission he was given to store "personal items on the property and stay overnight in the garage." [Record No. 31 at 2] But even if Phillips had a subjective belief that he had a reasonable expectation of privacy in Schuler's home—the driveway is not within the home's curtilage. Nothing is obstructing the view or access to the driveway from the road, and Phillips concedes this point. *Id.* at 2. Instead, he notes that the "road itself is small and secluded, infrequently trafficked by anyone except the very few individuals that own land or homes along the road." *Id.* But living in a rural area does not magically convert an otherwise unobstructed and unobscured driveway into curtilage.

Phillips contends that the officers, assuming they were lawfully at the home to serve Tutt, exceeded the scope of a "knock and talk" by "walking up the driveway and peering into car windows, [and] trying to arouse sleeping individuals." *Id.* at 3. The officers were there to serve Tutt legal papers, not to gather evidence. The uncontroverted testimony establishes that the officers parked in the driveway behind the SUV and walked up the driveway to the front door. This is a standard way any other citizen would approach a home. Indeed, they took a detour once they saw individuals that they believed to be overdosing but did not impermissibly

exceed the scope of their purpose.  Phillips did not have a reasonable expectation of privacy in Schuler's driveway that was not in the curtilage of the home, and the officers did no more than a private citizen would do when they walked up the driveway to the front door.

**Warrantless Opening of Vehicle Door**

Police officers are often called upon to engage in community caretaking functions that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973).  When an officer is performing a community caretaking function "rather than [a] traditional law-enforcement function," an exception to the Fourth Amendment warrant requirement is recognized.  *Taylor v. City of Saginaw*, 922 F.3d 328, 335 (6th Cir. 2019) (citing *Ziegler v. Aukerman*, 512 F.3d 777, 785 (6th Cir. 2008)).  The community caretaker role includes responding to exigent circumstances when an officer must "render emergency assistance to an injured occupant." *Kentucky v. King*, 563 U.S. 452, 460 (2011) (citing *Brigham City, Utah v. Stuart*, 543 U.S. 398, 403 (2006)).

In determining whether such an exigency exists, courts consider the "totality of the circumstances and the inherent necessities of the situation at the time."  *United States v. Huffman*, 461 F.3d 777, 783 (6th Cir. 2006) (citing *United States v. Rohring*, 98 F.3d 1506, 1511 (6th Cir. 1996)).  This is an objective test: "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'"  *Stuart*, 543 U.S. at 404 (citing *Scott v. United States*, 436 U.S. 128, 138 (1978)).

Phillips argues that by opening the doors, the officers instituted a warrantless search, violating his Fourth Amendment rights.  He alleges that the officers did not do enough to try

and wake the occupants before opening the door. Additionally, he contends that the officers did not have a reasonable belief that the occupants were overdosing because their seats were reclined, which is indicative of someone sleeping. But even if they had such a belief, Phillips argues that they exceeded the permissible scope of the initial intrusion when they "began looking into the interior of the vehicle for incriminating evidence." [Record No. 31 at 5]

Sheriff Lucas testified that on the way to the front door, he noticed that the SUV was running and that the occupants appeared to be either overdosing, passed out, or sleeping. He knew Schuler's home was a place where people partied and did drugs. Once at the driver's window, he recognized Phillips and knew that he was involved with drug trafficking. Further, he testified that he had recently responded to several overdoses in Lee County. [Record No 30 at 21] After tapping on the window and calling Philips' name to no avail, the officers opened the unlocked front vehicle doors to check on the occupants' well-being. At that point, the officers immediately began looking for signs of drug use within the occupants' reach.

Considering the totality of the circumstances, the officers had a reasonable belief that the occupants needed emergency medical assistance. They took reasonable steps to rouse them before opening the doors, which was a justified intrusion because a reasonable officer would perceive the situation to be exigent. Further, visually scanning the vehicle for signs of drugs or drug use was no more than what a citizen may do and was reasonably related to the purpose of the initial intrusion. Additionally, the subject case was not viewed through either opened door but rather through the rear passenger window.

**Plain View Exception**

The plain view exception comports with the Fourth Amendment because observing or seizing an item in plain view does not "involve an intrusion on privacy." *See Horton*, 496 U.S.

at 133–34, 141 n.11.  The plain view exception applies when four conditions are satisfied: (1) the object is in plain view; (2) the officer is "legally present in the place from which the object can be plainly seen"; (3) the "object's incriminating nature [is] immediately apparent"; and (4) the officer has a lawful "right of access to the object." *Garcia*, 496 F.3d at 508 (citing *Horton*, 496 U.S. at 136–37; *United States v. McLevain*, 310 F.3d 434, 438–39 (6th Cir. 2002)).  It is the government's burden to prove the legality of a seizure under the plain view doctrine. *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007).

### Object in Plain View

It stands to reason that the first requirement of the plain view exception is that the object is observed in plain view.  Phillips does not explicitly object to the R&R regarding whether the case was in plain view.  [*See* Record No. 31.]  Officer Lucas testified that he initially opened the front driver's door where Phillips was seated, but as he was "looking around," he was able to view the case through the rear passenger window.  Although the SUV windows were slightly tinted, photos of the vehicle show that it was daylight and that the tint on the windows was light enough to see through.  [Record No. 30 at 29] There is no indication that the case was not in plain view.

### Officer Legally Present

"[L]aw enforcement officers may seize evidence in plain view, provided they have not violated the Fourth Amendment in arriving at the spot from which the observation of the evidence is made." *King*, 563 U.S. at 463.  As discussed above, Phillips objects to the Magistrate Judge's determination that the officers were lawfully present in Schuler's driveway. Referencing the above analysis, the officers were lawfully present in Schuler's driveway because they were there to serve Tutt and believed Philips and the passenger to be overdosing.

- 9 -

**Incriminating Nature Immediately Apparent**

To determine whether an object's incriminating nature is immediately apparent, courts consider: (1) the "nexus between the seized object and the items particularized in the warrant"; (2) "whether the intrinsic nature or appearance of the object gives probable cause to believe it is associated with criminal activity"; and (3) "whether the executing officers can *at the time* of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature." *Garcia*, 496 F.3d at 510 (emphasis in original) (citations and quotations omitted); *see also United States v. Pacheco*, 841 F.3d 384, 395 (6th Cir. 2016). To satisfy immediately apparent, an officer "must recognize the incriminating nature of the object as the result of his [or her] instantaneous sensory perception."[3]  *Garcia*, 496 F.3d at 511 (citations omitted).

The Supreme Court of the United States has noted that immediately apparent was "'very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the "plain view" doctrine.'"  *Pacheco*, 841 F.3d at 395 (quoting *Texas v. Brown*, 460 U.S. 730, 741 (1983) (plurality opinion)).  Instead, it requires that the plain view seizure be "'*presumptively reasonable, assuming that there is probable cause to associate the property*

---

[3] *See Texas v. Brown*, 460 U.S. 730, 746 (1983) (explaining criminal nature of deflated tied balloon was immediately apparent where the officer associated the object with the practice of carrying narcotics and no innocent item is commonly contained this way); *United States v. Truitt*, 521 F.2d 1174, 1177 (6th Cir. 1975) (finding incriminating nature immediately apparent for sawed-off shotgun found in private hands); *United States v. Poulos*, 895 F.2d 1113, 1122 (6th Cir. 1990), *abrogated on other grounds by Horton*, 496 U.S. 128 (concluding firearm silencer components were, "by their very nature, intrinsically suspicious, and that their criminality was immediately apparent").

*with criminal activity.*'"  *United States v. Beal*, 810 F.2d 574, 577–78 (6th Cir. 1987) (emphasis in original) (quoting *Brown*, 460 U.S. at 741–42).  The immediately apparent requirement is "necessary to prevent officers from using the plain view doctrine as a means to extend a particularized search . . . into an unlawful exploratory search."  *Pacheco*, 841 F.3d at 395 (quoting *Garcia*, 496 F.3d at 510 (citing *Horton*, 496 U.S. at 136–37)).

When considering whether probable cause was immediately apparent, a "'reviewing court should be duly mindful of the executing officers' particular, subjective training and experiences.'"  *Pacheco*, 841 F.3d at 395–96 (quoting *United States v. Szymkowiak*, 727 F.2d 95, 98 (6th Cir. 1984) (citing *Brown*, 460 U.S. at 745 (Powell, J., Concurring))).  Additionally, when determining if there was probable cause regarding the object's incriminating nature, what the officers knew and the circumstances surrounding the item found in plain view are also relevant.  *See e.g.*, *United States v. Rodriguez*, 596 F.2d 169, 175 (6th Cir. 1979) (considering an officer's experience and the context in which a powdery substance was found in finding the incriminating nature of the substance was immediately apparent).

Intrinsically innocent items—such as a fountain pen or a combination of intrinsically innocent items such as a twist tie, cut cigarette filter, or spoon with residue—are not immediately incriminating.  *Beal*, 810 F.2d at 576–77; *McLevain*, 310 F.3d at 441.  If an object "appears suspicious to an officer but further investigation is required to establish probable cause as to its association with criminal activity," then its incriminating nature is not immediately apparent.[4]  *Garcia*, 496 F.3d at 511 (citations omitted).

---

[4] *See United States v. Gray*, 484 F.2d 352, 355 (6th Cir. 1973) (holding the illegality of rifles were not immediately apparent because that determination required copying down their serial numbers and running them through a database); *United States v. McLernon*, 746 F.2d 1098, 1125–26 (6th Cir. 1984), *holding modified on other grounds by United States v. Damra*, 621

Probable cause does not require that the officer have knowledge that the evidence is contraband. *McLevain*, 310 F.3d at 441. Rather, probable cause "merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband . . . it does not demand any showing that such a belief be correct or more likely true than false." *Brown*, 460 U.S. at 742 (internal citation omitted). It is a "flexible, common-sense standard." *Szymkowiak*, 727 F.2d at 99 (citation omitted). Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *United States v. Ellis*, 497 F.3d 606, 613 (6th Cir. 2007) (cleaned up). Probable cause does not require officers to rule out possible innocent explanations for suspicious facts. *See Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983).

**Containers**

Items in containers can fall within plain view under limited circumstances. Generally, the Fourth Amendment protects "the owner of every container that conceals its contents from plain view." *United States v. Ross*, 456 U.S. 798, 822–23 (1982). However, the plain view exception may permit the warrantless seizure of a closed container where the container's outward appearance enables an observer to infer its contents. *Arkansas v. Sanders*, 442 U.S.

---

F.3d 474 (6th Cir. 2010); (finding "probable cause of criminality was neither immediate nor apparent" for a note pad and calendar because they were "intrinsically innocent" items found on most desks); *United States v. Szymkowiak*, 727 F.2d 95, 99 (6th Cir. 1984) (determining the criminality of firearms required disassembly such that probable cause was not apparent from their intrinsic nature); *United States v. Beal*, 810 F.2d 574, 577–78 (6th Cir. 1987) (holding the incriminating nature of unusually heavy pens later found to have the capacity to shoot bullets was not immediate nor apparent); *United States v. Garcia*, 496 F.3d 495, 510 (6th Cir. 2007) (finding the seized documents did not satisfy the immediately apparent requirement because they needed to be read for their "incriminating nature to be determined").

753, 764 n. 13 (1979*), overruled on other grounds by California v. Acevedo*, 500 U.S. 565 (1991) (noting that "some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance").  Such containers remain subject to plain view because where a "distinctive configuration of a container proclaims its contents, the contents cannot be fairly said to have been removed from a searching officer's view."  *Robbins v. California*, 453 U.S. 420, 428 (1981), *overruled on other grounds by Ross*, 456 U.S. 798.

The United States Court of Appeals for the Sixth Circuit[5] has applied the immediately apparent test to justify the seizure of objects found in plain view that are in a container that "proclaims its contents."  The panel in *United States v. Morgan* determined that pill bottles labeled with names of controlled narcotics made it "immediately apparent" to the agents that they were evidence of a crime.  744 F.2d 1215, 1222 (6th Cir. 1984).  Likewise, in *United States v. Martin*, drawing an analogy to *Morgan* the panel noted that a container the officer "recognized as an ammunition box" functioned as a label, which made the connection to criminal activity both immediate and apparent.  No. 90–6318, 1991 WL 158748 at *4 (6th Cir. Aug. 19, 1991).

---

[5] So too have district courts in this circuit: *United States v. Tucker*, 57 F. Supp. 2d 503, 516 n.8 (W.D. Tenn. 1999), *aff'd*, 8 F. App'x 364 (6th Cir. 2001) (suggesting "[i]f it were readily apparent from the boxes' external markings that the contents were ammunition for either of the illegal weapons uncovered on the premises or illegal in and of itself, then the agents would have had an additional basis for conducting a warrantless search of the two ammunition boxes based on the markings on the outside of the boxes"); *United States v. Smith*, No. 17-CR-258, 2022 WL 2965161 at *30–*31 (N.D. Ohio July 27, 2022) (finding the criminality of a container the officer recognized as a gun case was immediately apparent bringing its contents in plain view).

- 13 -

The plain view exception allows a warrantless *seizure* of a container and the contents within; however, it is unclear when a *search* of a container is permissible absent a warrant or exception.  "The transformation of the plain view doctrine from authorization to seize [a container] to authorization to seize and search [a container] without a warrant is significant and has never been explicitly considered by the Supreme Court."[6] Lewis R. Katz, John Martin, & Jay Macke, *Baldwin's Oh. Prac. Crim. L.*, Closed containers § 16:8 (3d ed.).  This lack of clarity has resulted in some circuits creating what is commonly called "single-purpose container" tests for when the *search* of a container found in plain view is authorized.  See *infra*. Even more, some circuits have collapsed the search and seizure authorization into one for contained objects—meaning that once a container satisfies the plain view exception, it may also be opened.  *United States v. Telfair*, 507 F. App'x 164, 173–74 (3d Cir. 2012) (collecting cases).

The standard applied within the Fourth Circuit for a contained item found in plain view includes two parts: one for seizure and one for search.  *See United States v. Davis*, 690 F.3d 226, 235 (4th Cir. 2012) (regarding clothes contained in a bag beneath a hospital bed).  Lawful *seizures* require that the incriminating nature of the container be immediately apparent.  *Id.*

---

[6] The lack of clarity in two Supreme Court plurality decisions have resulted in a circuit split regarding the proper test for a "single-use container."  *Compare Texas v. Brown*, 460 U.S. 730 (1983) (allowing the court to consider officer training and experience to determine that a deflated tied balloon's incriminating nature was immediately apparent because the officer recognized it as a common method of containing narcotics) *with Robbins v. California*, 453 U.S. 420, 427 (1981), *overruled on other grounds by United States v. Ross*, 456 U.S. 798 (1982) (suppressing marijuana found in wrapped plastic blocks recognized by police as a common way to package marijuana because they were outside the *Sanders* footnote 13 exception for gun and burglary tool cases). In *Brown*, two concurrences, which encompassed a majority of the Court, understood the balloon to be a container.  *See* 460 U.S. at 746 (Powell, J. joined by Blackmun, J. concurring); *accord* 460 U.S. at 747 (Stevens, J., joined by Brennan, J. and Marshall, J. concurring).

But a *search* of that container is warranted only if those contents were a "foregone conclusion," which includes open or transparent containers and those that proclaim their contents such that they support no reasonable expectation of privacy. *Id.* (citing *United States v. Williams*, 41 F.3d 192, 197 (4th Cir. 1994)). Courts may consider the surrounding circumstances and the officer's training and experience to determine whether a container's contents are immediately apparent and whether they are a "foregone conclusion." *Williams*, 41 F.3d at 197–98; *Davis*, 690 F.3d at 235.

The Ninth Circuit requires that officers assess containers primarily from the perspective of a layperson "rather than 'solely . . . by the experience and expertise of law enforcement'" because doing so protects a person's reasonable expectation of privacy. *United States v. Gust*, 405 F.3d 797, 801–03 (9th Cir. 2005) (regarding a closed black bag carried by a pedestrian) (quoting *United States v. Miller*, 769 F.2d 554, 560 (9th Cir. 1985)). In reaching this result, the panel in *Gust* interpreted the Supreme Court's plurality decision in *Robbins v. California* as a limitation on *Sanders*' footnote 13.[7] *Gust*, 405 F.3d at 801–03. The panel interpreted the plurality's decision in *Robbins* to mean "that the police could not rely on the footnote 13 exception to justify the warrantless *search* of packages described as 'plastic wrapped green blocks.'" *Id.* at 801–03 (emphasis added) (citing *Robbins*, 453 U.S. at 428). The panel's concern was that broadly reading footnote 13 "could result in a rule that essentially permits law enforcement to conduct warrantless *searches* of indistinct and innocuous containers based solely on probable cause derived from the officers' subjective knowledge and the

---

[7] "[S]ome containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance[.]"

circumstances." *Gust*, 405 F.3d at 802 (emphasis added). The single-purpose container test applied in *Gust* pertained to the *search* of the case found in plain view—not its *seizure*.

Recognizing the importance of both approaches, a panel within the Third Circuit applied a hybrid test that considered both the perspective of law enforcement and a person's reasonable expectation of privacy in a closed container that was subject to a warrantless *search*. *United States v. Telfair*, 507 F. App'x 164, 174–75 (3d Cir. 2012) (regarding heroin contained in a refrigerator riddled with bullet holes).

The various circuits attempt to resolve the question of when the *search* of a container is authorized under the plain view exception.[8] But none involve containers found in vehicles. This is because the automobile exception already permits warrantless *searches* of items that are subject to seizure under the plain view exception.

The automobile exception allows both search and seizure of contents found inside containers under certain conditions. *Ross* and *California v. Acevedo* overruled *Robbins* insomuch as it forbade the opening of containers in vehicles in an otherwise lawful search. *Ross*, 456 U.S. at 824 (holding that when police have probable cause to search an entire vehicle, they may search any part of the vehicle where the object of the search could be found); *Acevedo*, 500 U.S. at 573 (answering "no" to the question left open in *Ross* regarding whether police need a search warrant to open a movable container found in a vehicle when there is only

---

[8] The Tenth Circuit case Phillips cites, *United States v. Bonitz*, does appear to support his position insomuch that it suggests that only soft (not hard) gun cases can ever reveal its contents (despite a firearms expert being able to identify it as such). 826 F.2d 954, 956–57 (10th Cir. 1987). But that harsh categorical distinction is an outlier to other circuits' application of *Sanders*' footnote 13. Further, the panel in *Bonitz* was disturbed by the search that uncovered these items allegedly found in "plain view" because after the police executed an arrest warrant and handcuffed the defendant, they proceeded to search his home for two-and-a-half hours without consent or a search warrant.

probable cause to search that container). Therefore, a container observable within an automobile may be subject to both seizure (under the plain view exception) and search (under the automobile exception).

That said, the undersigned acknowledges that the test within the Sixth Circuit for when a container found in plain view may be *searched* without a warrant (or applicable exception) is less than clear. The panel in *Morgan* was concerned with the seizure and not the search of the defendant's luggage and pill bottles because it was the common carrier that instigated the initial search. *Morgan*, 744 F.2d at 1222–23. Seeming to conflate search and seizure, in *Martin* (an unpublished case), the panel recognized the opening of the ammunition box to be a search but construed the issue as "whether it was 'immediately apparent' that the box was evidence of illegal activity." *Martin*, 1991 WL 158748 at *3. Recently, in *Lewis*, the panel noted in dicta that the plain view exception allows the *seizure* of a container but that a *search* requires a warrant or applicable exception. *Lewis*, 81 F.4th at 654 (applying the concept of a container to a digital file accessible only by a forensic scan) (citing *Horton*, 496 U.S. at 141 n.11; *Hopkins v. Nichols*, 37 F.4th 1110, 1118 (6th Cir. 2022)). The undersigned need not resolve that issue today because the automobile exception applies to the search of Phillip's case.

Phillips argues that the Court should not apply Sixth Circuit case law to determine whether the incriminating nature of the case was immediately apparent to the officer. He insists instead that the standard is inappropriate because it was meant to apply to objects "without the extra layer of privacy afforded by a closed container." [Record No. 31 at 6]

Not so. The panels in *Morgan* and *Martin* applied the immediately apparent analysis to items in containers. 744 F.2d at 1222; 1991 WL 158748 at *4. *Martin* involved facts similar

facts to Phillips' situation.    There, the panel applied the immediately apparent test to a container that an officer recognized as an ammunition box. *Martin*, 1991 WL 158748 at *4. The police had an arrest warrant for Martin because he was seen driving a vehicle with stolen plates. *Id.* at *1.  After being told by his girlfriend that he was not home, the officers received her consent to look for Martin in their shared residence. *Id.* at *1–*2. While looking for Martin in a closet, an officer found the box. *Id.* at *2.  Because the police knew that Martin had prior felony convictions, it was immediately apparent to them that the box contained contraband or evidence of a crime because Martin was not allowed to possess ammunition. *Id.* at *4.

In reaching this result, the panel in *Martin* considered the circumstances under which the box was found, including what the police knew about Martin and ammunition boxes.  It went on to note that whether the contents match the container's exterior is irrelevant: "[t]o be sure, an ammunition box might be used to store cookies, just as a cookie jar can be used to store ammunition.   But the strong probabilities are that an ammunition box contains ammunition, just as most cookie jars contain cookies." *Id.*

Regarding Phillips' case, the context, coupled with the officers' experience and knowledge, supports that the incriminating nature of the case was immediately apparent. Before the encounter in Schuler's driveway, Sheriff Lucas had received information that Phillips was trafficking narcotics into Lee County from Lexington, Kentucky.  [Record No. 30 at 22–23] He knew that Phillips was a convicted felon and that Schuler's residence was a "party house."  Through his many years working in law enforcement, he understood that firearms are commonly used by those trafficking narcotics.

Lee County is a rural area where hunting and gun ownership are commonplace.  Sheriff Lucas has extensive experience with guns and gun cases and immediately recognized the case

as a gun case.  When he picked it up, it weighed roughly two-and-one-half pounds, further indicating it housed a firearm.  That it ultimately contained narcotics is immaterial.  Because he recognized the case to be a gun case and knew that Phillips was a convicted felon prohibited from possessing firearms, under the totality of the circumstances, he had probable cause to believe it contained evidence of a crime.

Phillips argues that the Court should adopt the Ninth and Tenth Circuits' approach and view the case from the perspective of a layperson.  [Record No. 31 at 6] He contends that the Fourth Circuit's law enforcement approach "could create a slippery slope for any nondescript container, in a certain situation, to be considered a single-purpose container."  *Id.*  But assuming that the case must be viewed from the perspective of a layperson to determine whether it can be searched, even a layperson could perceive the case to hold a firearm.  The distinctive Realtree hardwoods camouflage pattern is associated with and used in conjunction with hunting.  Realtree not only sells camouflage hunting apparel but also camouflaged gun cases.  REALTREE, https://realtree.com/gun-cases/ (last visited Feb. 20, 2025).

Phillips argues that the case is an odd length, too short to carry a rifle but too long to house a handgun, but a layperson seeing only 3/4 of the case could reasonably perceive it to be a gun case.  Because guns, like automobiles, are heavily regulated—a person's reasonable expectation of privacy is diminished in a case that looks like a gun case.  *See Sanders*, 442 U.S. at 764 n.13.  The fact that it was visible through the closed window of a vehicle further undercuts any reasonable expectation of privacy an individual may have had in the case.  Therefore, (assuming the automobile exception did not justify the search) even under the Ninth Circuit's test to *search* a closed container—the search was permissible.

Phillips argues that if the Fourth Circuit approach is applied, the case's contents were not a "foregone conclusion." As discussed previously, the Ninth and Fourth Circuits' tests (viewing a container from a layperson's perspective and considering if the contents are a "foregone conclusion") apply to when a container may be *searched*. For Phillips' this is irrelevant because a valid exception applies to the search because the case was viewed in an automobile. Even if this were not so, considering the context and officer experience (discussed above), the contents were a "foregone conclusion."

**Officer Lawful Right of Access**

The automobile exception provides a "lawful right of access" to search a vehicle when an item observed in plain view creates probable cause. *Galaviz*, 645 F.3d at 357 (citing *Boone v. Spurgess*, 385 F.3d 923, 928 (6th Cir. 2004)). This extends to movable containers in an automobile. *Acevedo*, 500 U.S. at 579–80. Applying the plain view exception to items found in a vehicle is justified because "a motorist has 'no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.'" *See United States v. Campbell*, 549 F.3d 364, 373 (6th Cir. 2008) (quoting *United States v. Bradshaw*, 102 F.3d 204, 211 (6th Cir. 1996)). Because a private citizen can peer into the interior of an automobile "from any number of angles," it is immaterial that an officer changes his or her position to observe items in plain view. *Brown*, 460 U.S. at 740.

Traditionally, the automobile exception was "based on the 'ready mobility' of the automobile, which created 'an exigency sufficient to excuse failure to obtain a search warrant.'" *Galaviz*, 645 F.3d at 355 (quoting *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007)). But subsequent cases have clarified that the exception "need not rest on an

independent showing of exigency, because '[e]ven in cases where an automobile was not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justified application of the vehicular exception.'" *Galaviz*, 645 F.3d at 355 (quoting *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007)).

Phillips argues that the officers did not have probable cause to believe that the case contained a firearm, and therefore, the automobile (and plain view) exception did not authorize the seizure and search of the case. [Record Nos. 20-1 at 9–10 and 31 at 9] Instead, he contends that the officers should have secured a warrant before seizing and searching the case. [Record No. 20-1 at 10] But that is not the legally correct. *See Galaviz*, 645 F.3d at 357.

Once the officers observed the case in plain view and had probable cause to believe it contained evidence of a crime, they were free to seize and search the container. *Ross*, 456 U.S. at 824; *Acevedo*, 500 U.S. at 573. Indeed, they *could have* sought a warrant before opening the case, but the automobile exception "need not rest on an independent showing of exigency." *Galaviz*, 645 F.3d at 355. Because the automobile exception applied and the container observed in plain view created probable cause, the officers had a "lawful right of access" to the container. *Id.* at 357 (citing *Boone*, 385 F.3d at 928).

**Reasonable Suspicion—Armed and Dangerous**

An officer may search the passenger compartment of an automobile if the officer "possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1036 (1983) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Reasonable suspicion is a less demanding standard than probable cause, as courts determine

whether it exists under the "totality of the circumstances" and by "view[ing] the evidence offered . . . using a common sense approach, as understood by those in the field of law enforcement." *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004). A weapon is within a person's "immediate control" when it is within an area where an individual could reach. *New York v. Belton*, 453 U.S. 454, 460 (1981) (citing *Chimel v. California*, 395 U.S. 752, 763 (1969)). This same logic justifies officers opening closed containers found within a vehicle, "for if the passenger compartment is within the reach of the arrestee, so will containers in it be within his reach." *Belton*, 453 U.S. at 460.

If the Court determines that Sherriff Lucas did not have probable cause to seize and search Phillips's case, the United States argues that his actions were supported by a lesser showing of reasonable suspicion because of the need to ensure officer safety. [Record No. 24 at 11–12]. Phillips argues that Sherriff Lucas had no reasonable suspicion to conclude that he possessed a weapon or that he might gain immediate control of a weapon. [Record No. 25 at 2–3]. Contrary to Phillips' assertion that "the officers had no information particular to Mr. Phillips to indicate that he was armed and dangerous or that he was involved in criminal activity," Sheriff Lucas testified that he had received information that Phillips was trafficking narcotics. And based on his experience in law enforcement, he knew that drug traffickers often carried firearms for protection.

Officers need not have *knowledge* that an individual is armed and dangerous. Instead, only reasonable suspicion is required. During the exchange at the vehicle, Sheriff Lucas testified that immediately after he stated, "[W]hat that gun case is there," Phillips' picked it up. Under the totality of the circumstances, Sheriff Lucas had reasonable suspicion that Phillips was dangerous and might gain immediate control of a weapon. Believing that the case

contained a gun based on its appearance and that it "had some weight to it," he had reasonable suspicion sufficient to believe Phillips was armed, which justified opening the case.

### IV.  Conclusion

For the foregoing reasons, it is hereby

**ORDERED** as follows:

1.    The magistrate judge's Report and Recommendation [Record No. 29] is **ADOPTED** and **INCORPORATED**, in full.

2.    Defendant Phillips' motion to suppress [Record No. 20] is **DENIED**.

Dated: February 20, 2025.

Danny C. Reeves, District Judge
United States District Court
Eastern District of Kentucky